**LOWENSTEIN SANDLER PC**
Bruce S. Nathan (BN 4844)
Bruce Buechler (BB 0324)
David M. Banker (DB 3278)
Stefan B. Kalina (SK 8535)
1251 Avenue of the Americas
New York, NY 10020
Tel.: (212) 262-6700

Counsel to Summa Capital Corp.


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- X

In re:                                                            Case No. 08-12666 (MG)

Pace Product Solutions, Inc.,


                        Debtor.                          Chapter 11

-------------------------------------------------- X


## MOTION OF SUMMA CAPITAL CORP. FOR ENTRY OF ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY AND FOR RELATED RELIEF

Summa Capital Corp. ("Summa"), by and through its counsel, Lowenstein Sandler PC, respectfully moves this Court, pursuant to section 362 and 105 of Title 11 of the United States Code (as amended, the "Bankruptcy Code"), for entry of an order: (a) granting relief from the automatic stay to permit Summa to exercise all of its rights and remedies under (i) the Agreements (as hereinafter defined) entered into by the above-captioned Debtor (the "Debtor"), (ii) the Uniform Commercial Code ("UCC") and (iii) other applicable law, including, without limitation, to take all action necessary to enforce its security interests in the Collateral (as hereinafter defined) securing the Debtor's obligations to Summa under the Agreements, including, without limitation, collecting accounts receivable, selling inventory, and applying all proceeds in reduction of the Indebtedness (as hereinafter defined); (b) directing the Debtor to segregate, account for and turn over to Summa all cash collateral and other Collateral of Summa in the Debtor's possession and control; (c) granting Summa access to recover its Collateral;

(d) directing the Debtor to turn over to Summa all books and records, including those maintained electronically on computer, relating to the Collateral; (e) prohibiting the Debtor from using the Collateral without Court approval, (f) prohibiting the Debtor from improperly converting the Collateral; and (g) allowing for the relief sought herein to remain in full force if the Debtor's bankruptcy case is dismissed and the Debtor files another bankruptcy case within 180 days of said dismissal, without the need to seek further relief from the automatic stay.  In support of this motion ("Motion"), Summa respectfully represents as follows:

## GROUNDS FOR VACATING THE AUTOMATIC STAY

1.    The relief requested in the instant Motion should be granted for the following reasons:

(a)    Cause exists for relief from the automatic stay under Section 362(d)(1) of the Bankruptcy Code since (i) the Debtor has improperly continued to use Cash Collateral since the Petition Date without Summa's consent or Court approval in violation of Section 363(c)(2) of the Bankruptcy Code; (ii) the Debtor cannot satisfy its burden of proof to adequately protect Summa's interest in the Collateral since, as the Debtor continues to operate, the value of the Collateral continues to diminish without any payment to Summa to compensate it for its loss; (iii) Summa believes that the Debtor is continuing to convert the Collateral by selling inventory and creating accounts receivable in the name of non-debtor entities with absolutely no benefit to Summa, the Debtor and its bankruptcy estate; (iv) prior to the commencement of this case, the Debtor had dissipated the Collateral in flagrant violation of New York Supreme Court Orders that were entered to protect the Collateral; and (v) this Chapter 11 case was filed in bad faith to hinder, delay, and frustrate Summa's efforts to lawfully enforce its rights in the Collateral.

(b)    The automatic stay should be lifted under Section 362(d)(2) of the Bankruptcy Code because (i) the Debtor lacks any equity in the Collateral and (ii) as

demonstrated by the Debtor's failure to file any pleadings other than a bare bones Chapter 11 petition and by the dissipation and conversion of the Collateral prior to the Debtor's Chapter 11 filing, the Debtor has no intention of reorganizing, cannot be trusted as a debtor-in-possession and the Collateral is, therefore, not necessary for the effective reorganization of the Debtor.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this application is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are §§ 362(d), 361, 363 and 105 of the Bankruptcy Code.

## FACTS

3.     The Debtor sells and distributes auto parts.

4.     Summa is a creditor of the Debtor and holds a first priority properly perfected security in virtually all of the Debtor's assets.

5.     As of the Petition Date, Summa was owed not less than $1,697,183.91, which includes principal and interest through the Petition Date and attorneys' fees and expenses through May 31, 2008, together with interest that continues to accrue and all of Summa's attorneys' fees, costs, and expenses incurred thereafter (collectively, the "Indebtedness").

6.     On July 10, 2008 (the "Petition Date"), the Debtor commenced a voluntary case under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court").  Upon information and belief, the Debtor is in possession of its assets and is operating as debtor and debtor-in-possession.

7.     To date, the Debtor has neither filed its first day affidavit pursuant to S.D.N.Y. L.B.R. 1007-2 nor any "first day motions."

8.     The Debtor continues to operate and to presumably use the Collateral, which is cash collateral as defined by Section 363(a) of the Bankruptcy Code, without the

consent of Summa or approval from the Court, **all in flagrant violation of Section 363(c)(2) of the Bankruptcy Code**.

A.       The Debtor's Secured Financing Arrangement with Summa.

9.       Summa and the Debtor were parties to a commercial financing arrangement by which Summa had continuously made working capital advances to the Debtor based on the Debtor's eligible accounts receivable and inventory.   Their arrangement was memorialized in a "Financing Agreement" executed by the Debtor dated January 10, 2006, as amended (the "Financing Agreement").  See, Declaration of Howard Schulder dated July 16, 2008 ("Schulder Decl."), Exs. "A" and "B".  Pursuant to the Financing Agreement, Summa had agreed to make discretionary advances on a revolving basis to the Debtor of up to 80% of eligible accounts receivable and 30% of eligible inventory of the Debtor, up to a credit limit of $1,500,000.  Id.  Pursuant to the Financing Agreement, the Debtor was, inter alia, obligated to turn over to Summa all collections of Summa's accounts receivable Collateral to pay down Summa's claim against the Debtor and Summa is entitled to charge interest as provided in the Financing Agreement. Schulder Decl., Ex. "A." Boaz Bagbag ("Bagbag") (who had executed and delivered to Summa his unconditional guaranty of payment of all of the Debtor's obligations to Summa under the Financing Agreement and who also had filed his own Chapter 7 bankruptcy petition on July 10, 2008) executed the Financing Agreement as the Debtor's President. Id; See also, Schulder Decl., Ex. C.

10.       As collateral security for the Debtor's payment of all of its obligations to Summa under the Financing Agreement, the Debtor granted Summa a security interest in the following assets of the Debtor:

> All present and future accounts and contract rights, including all related documents, instruments and chattel paper, and all present and future general intangibles;

> All present and hereinafter acquired inventory of debtor, wherever located, including raw materials, work in process, finished goods,

finished merchandise, and wrapping, packing and shipping materials;

All present and hereinafter acquired equipment of debtor, machinery, fixtures, vehicles, furniture, tools, discs, jigs and attachments, wherever located, together with all additions, replacements, accessions and improvements, thereto; and

Proceeds of all the foregoing

(collectively, the "Collateral"). Schulder Decl., Exs. "A," "D," "E" and "F."

11.    The Debtor granted Summa a security interest in the Collateral pursuant to the Financing Agreement, the "Security Agreement-Inventory" dated January 10, 2006 and the "Security Agreement-Equipment" dated January 10, 2006, each executed by the Debtor. Schulder Decl., Exs. "E" and "F."  The Financing Agreement, together with the Security Agreement-Inventory and the Security Agreement-Equipment are hereinafter collectively referred to as the "Agreements."  Pursuant to the Agreements and a duly filed UCC-1 Financing Statement, Summa holds a first priority properly perfected security in the Collateral. Schulder Decl., Ex. "G."

B.    Debtor's Breaches of the Secured Financing Arrangement.

12.    Under the Agreements, the Debtor covenanted and warranted to promptly repay Summa's advances by (a) delivering all collections of accounts receivable Collateral to Summa and (b) ensuring that all receivables Collateral would remain free from encumbrances by anyone other than Summa and (c) none of the receivables Collateral would be subject to offsets and or claims by account debtors. Schulder Decl., Ex. "A."  In the latter two events, Debtor further agreed to reimburse Summa for the full value of any encumbered and/or disputed receivables. Id.

13.    Prior to the Petition Date, the Debtor breached its covenants and warranties with respect to the receivables.  Commencing February 8, 2008 and continuing through the Petition Date, the Debtor stopped delivering collections of Summa's receivables Collateral to Summa and, instead, improperly retained such collected receivables.  Moreover, the

Debtor improperly permitted uncollected receivables to become subject to various claim(s) by its own account holder(s) and/or account debtor(s) without reimbursing Summa for the full value thereof.

14.    As a consequence of the Debtor's breaches of the Agreements, the Debtor became indebted to Summa in excess of the credit limit under the Agreements.  On or about March 11, 2008, Summa notified the Debtor of its defaults under the Agreement and demanded full payment of the then outstanding sum of $1,506,253.35 owing as of February 29, 2008, together with interest and attorneys' fees and other costs incurred in connection with its breaches. Schulder Decl., Exs. "H" and "I."  Summa demanded that the Debtor and/or its guarantors, including Bagbag himself and certain other companies for which he serves as president, that had executed guarantees in favor of Summa, satisfy the Indebtedness by repaying the outstanding balance and turning over Summa's receivable, inventory and other Collateral. Neither the Debtor nor its guarantors satisfied any portion of the Indebtedness.  Consequently, interest and fees continue to accrue on the Indebtedness.

C.    The State Court Action and Orders.

15.    On or about March 20, 2008, Summa commenced suit against the Debtor and its guarantors in the Commercial Division of the Supreme Court of the State of New York, Westchester County, to recover the Indebtedness. Schulder Decl., Ex. "J."  The action is entitled "Summa Capital Corp. v. Pace Product Solutions, Inc., et al., Index Number 5998/08" (the "State Court Action").  By its Verified Complaint, Summa sought replevin of its secured inventory and other physical collateral.  Summa also sought money damages in the amount of the outstanding Indebtedness arising from the Debtor's breach of the Agreements and the guarantors' breach of their respective guarantees.

16.    Simultaneous with filing the State Court Action, Summa brought an emergency motion by Order to Show Cause for an Order of Seizure of all of Summa's inventory, equipment, and other physical Collateral in Debtor's possession (the "Replevin Motion"). Schulder Decl., Ex. "K." The Order to Show Cause on the Replevin Motion was signed on

March 21, 2008, and the Replevin Motion was submitted on May 2, 2008. The matter was fully briefed by the parties and remained <u>sub judice</u> before the State Court when the bankruptcy petition was filed by the Debtor. Schulder Decl., Ex. "L."

17.    Pursuant to the Agreements and Article 9 of the New York State UCC, on or about March 25, 2008 and April 14, 2008, Summa sent written notices to the Debtor's account debtors that Debtor's receivables had been assigned to Summa and, therefore, to pay all sums owing on Summa's receivables Collateral to Summa. On or about April 30, 2008, Summa sent a second round of notices to the Debtor's account debtors. Copies of exemplars of these several notices are annexed to Schulder Decl. as Ex. M.

18.    Pending resolution of the Replevin Motion, the State Court "So-Ordered" a Stipulation between Debtor and Summa (the "April 9th Order"). Schulder Decl., Ex. "N." The April 9th Order imposed several affirmative duties upon the Debtor to protect the Collateral. Principally, the April 9th Order required that while the Debtor conducted business it must cease disposing of the Collateral outside of the ordinary course of business and must restore, preserve and keep the level of inventory and amount of receivables that existed prior to the Default Date (the "Preservation Requirement") to wit:

> That the [Debtor] **shall not dispose of Summa's collateral, to wit: the receivables, inventory,** equipment and general intangibles as more fully described in the [Replevin Motion]…in any fashion…except as required in the ordinary course of Pace's business and only insofar as it remains within the limits of Pace's daily activity and in compliance with the [Agreements]; Schulder Decl., Ex. "N" at ¶ 4 (emphasis added)

> That the [Debtor] shall preserve and keep all secured collateral and books and records relating to said collateral **in and at the same amount(s), level(s), and location(s) as existed prior the Defendants' alleged default(s)** under the Agreements. <u>Id</u>. (emphasis added)

19.    The April 9th Order also required the Debtor to provide Summa with unlimited access to Debtor's place of business located at 122 School Street, Yonkers, New York

(the "Premises") to inspect and observe the Collateral, including the books and records relating thereto (the "Inspection Requirement") and to ensure compliance with the Preservation Requirement to wit:

> That [Debtor] shall provide Summa and all agents of Summa with **unlimited and on-going access to observe and inspect the collateral and all books, records**, reports, and documents relating to the collateral wheresoever located" including "Pace's premises located in Yonkers, NY;" Schulder Decl., Ex. "N" at ¶ 6 (emphasis added)

20.    In addition, the April 9th Order required Debtor to resume providing Summa with detailed and timely financial reports regarding Debtor's inventory sales and receivable collections (the "Reporting Requirement") to wit:

> That the [Debtor] shall resume and continue [to] provide to Summa any and all **detailed daily reports** for Pace and Flash Sales on an on-going, daily basis, including without limitation the Daily Reports, the Availability Reports, the Over Advance Reduction Reports, Accounts Receivable To Date By Location Reports, A/R Reports, Charge Daily Totals By Location Reports, Inventory Value Reports, Inventory Value By Location Reports, Daily Payments and Adjustments by Location Reports (collectively, the "Daily Reports"); <u>Schulder Decl., Ex. "N" at ¶ 8 (emphasis added)</u>

> That the Defendants shall resume and continue to provide to Summa current **detailed Inventory Valuation Reports** for Pace and Flash Sales on an on-going basis; Schulder Decl., Ex. "N" at ¶ 9 (emphasis added)

> That the Defendants shall resume and continue to provide to Summa current **detailed Accounts Receivable Aging Reports** for Pace and for Flash Sales on an on-going basis; " Schulder Decl., Ex. "N" at ¶ 10 (emphasis added)

> That the Defendants shall provide to Summa current **detailed Accounts Payable Aging Reports** for Pace and for Flash Sales on an on-going basis. Schulder Decl., Ex. "N" at ¶ 11 (emphasis added).

21.    The Debtor violated the Preservation, Inspection and Reporting Requirements of the April 9th Order.  Accordingly, Summa was forced to bring its second emergency motion in the New York Supreme Court, by Order to Show Cause, to punish the Debtor for contempt of the April 9th Order (the "Contempt Motion"). ").  Schulder Decl., Ex. "O."  Pursuant to the Order to Show Cause signed by the New York Supreme Court of June 2, 2008, and in light of the Debtor's violations of the April 9th Order, the State Court issued a temporary restraining order (the "June 2nd TRO") pending resolution of the Contempt Motion. The April 9th Order and June 2nd TRO are hereinafter collectively referred to as the "State Court Orders."  The June 2nd TRO supplemented the Preservation Requirement of the April 9th Order and prevented the Debtor:

> from making or suffering any sale, assignment or transfer of, or any interference with, or any payment over, or other disposition of any interest in the Collateral.

The Debtor was thus no longer able to conduct business.  The June 2nd TRO and the balance of the April 9th Order remained in effect up to Petition Date, including the Inspection and Reporting Requirements.  The Contempt Motion was submitted June 20, 2008, was fully briefed and also remains <u>sub judice</u> before the State Court. ").  Schulder Decl., Ex. "L."

D.    <u>Debtor's Violations of the State Court Orders</u>.

22.    The State Court Orders sought to protect the Collateral.  In blatant violation of the State Court Orders, the Debtor converted the Collateral without benefiting from the proceeds in a systematic effort to deplete the Debtor prior to its Chapter 11 filing.  Debtor's pre-petition misconduct (which continues to this day) violated the State Court Orders.  <u>See</u> <u>infra</u>.

(a)    *Debtor's Conversion of Assets.*

23.    On April 22, 2008, **less than two weeks** after the April 9th Order was signed, Bagbag created and began operating a separate and new entity known as Worldwide Flash Auto Parts, Inc. ("Worldwide").  Schulder Decl., Ex. "P."  As shown by the parts/pricing list circulated by the Debtor to its customers one day after the June 2nd TRO was issued, the

Debtor began using Worldwide, and possible other entities created by Bagbag, as a vehicle to intentionally dispose and dissipate the Collateral. Schulder Decl., Ex. "Q." First, the Debtor demanded that certain of its customers pay Worldwide, instead of the Debtor, for purchases of Summa's inventory Collateral. Second, the Debtor sold the Collateral under Worldwide's name, with no proceeds payable to the Debtor. Schulder Decl., Ex. "R" at ¶¶ 4-5. In both instances, the Debtor purposefully reduced the available inventory and receivables. On June 6, 2008, **only four days after the June 2nd TRO was signed**, the Debtor purportedly elected to make Worldwide its subsidiary. Schulder Decl., Exs. "S" and "T" at ¶¶ 6-7. Nonetheless, Summa has no security agreements with Worldwide and never consented to the Debtor's conversion of the Collateral, and the transfer of Summa's collateral to Worldwide and/or other third parties was in blatant violation of the State Court Orders and the Agreements. Schulder Decl., Exs. "D" and "G."

24.    In addition, the Debtor used physical threats in an attempt to force account debtors to pay the Debtor in lieu of Summa and in contravention of the notifications sent by Summa under the UCC. Schulder Decl., Exs. "M" and "U" at ¶ 4. On at least one occasion, the Debtor's agents visited an account debtor, demanded payment in exchange for a release of any future claim. When that account debtor refused, the Debtor's agents physically threatened him. The account debtor indicated that the Debtor was treating several account debtors in similar fashion.

25.    Debtor's pre-petition conversion of the Collateral was also demonstrated by the constant reduction in receivable and inventory collateral in response to entry of the State Court Orders. The Orders expressly prohibited disposition of any of the Debtor's receivable and inventory assets that secured payment of Summa's claim against the Debtor. As a threshold matter, the initial Preservation Requirement of the April 9th Order obligated the Debtor to restore, preserve and keep the Collateral at amounts and levels existing prior to the Default Date under the Agreements. The June 2nd TRO then prevented Debtor from selling the inventory and disposing of the receivables. Yet, according to Debtor's daily summary reports, Debtor neither

restored nor preserved any of the Collateral at the pre-default benchmark. Rather, based on the limited information provided by the Debtor below (and without any ability to verify said information's accuracy in light of Debtor's failure to report and provide access, as discussed below), the Debtor continuously and increasingly disposed the Collateral in direct contravention of the State Court Orders. Considering the Debtor's track record, the "bleed" on the Collateral may be significantly worse than stated by the Debtor and reflected below.

26.     As of February 29, 2008, Debtor's net accounts receivables were $975,982.22 and its inventory was $1,784,184.34 for a total of $2,760,166.56. Schulder Decl., Ex. "V."

27.     As of March 21, 2008, when the order to show cause on the Replevin Motion was signed, Debtor's net accounts receivables were $961,320.88 and its inventory was $1,740,336.50 for a total of $2,701,657.38. Schulder Decl., Ex. "W."

28.     As of the April 9th Order, the Debtor's net account receivables were $672,870.39 and its inventory was $1,683,139.80 for a total of $2,356,010.19. Schulder Decl., Ex. "X." **Thus, between March 21, 2008 and the April 9th Order, the receivables Collateral dropped $288,450.49 and Summa's inventory collateral also dropped $57,196.70 for total collateral deterioration of $345,647.19 from March 21st.** Schulder Decl., Ex. "Y" at ¶ 15.

29.     As of May 27, 2008, shortly before Summa filed its Contempt Motion and while Summa's Replevin Motion was still pending, Debtor's net account receivables were $484,027.74 and its inventory was $1,688,155.67 for a total of $2,172,183.41. Schulder Decl., Ex. "Z." **Thus, between the April 9th Order and the filing of the Contempt Motion, Summa's receivables Collateral dropped another $188,842.65 for a total collateral deterioration of $529,473.97 from March 21, 2008. This deterioration represents nearly one-third of the total Indebtedness.** Schulder Decl., Ex. "Y" at ¶ 17.

30.     As of June 3, 2008, one day after the June 2nd TRO was issued, Debtor's net accounts receivables were $425,306.42 and its inventory was $1,656,731.01 for a total of $2,082,037.43. Schulder Decl., Ex. "AA."

31.    By June 15, 2008, one day before Summa filed its reply brief in support of its Contempt Motion, Debtor's net accounts receivables were $380,225.36 and its inventory was $1,610,549.95 for a total of $1,990,775.31. Schulder Decl., Ex. BB." **Thus, in the approximate two weeks after the June 2nd TRO was issued, Summa's receivables Collateral dropped an additional $45,081.06.** Schulder Decl., Ex. "U" at ¶ 5.

32.    By June 17, 2008, one day after Summa filed its reply brief in support of its Contempt Motion, Debtor's net accounts receivables were $321,190.56 and its inventory was $1,604,392.03 for a total of $1,925,582.59. Schulder Decl., Ex. "CC." **Thus, since briefing finished on the Contempt Motion and while the June 2nd TRO remained in effect, Summa's receivables Collateral dropped another $59,034.80 representing an approximate increased rate of receivable deterioration of 30%.** Schulder Decl., Ex. "U" at ¶ 5.

33.    As of July 9, 2008, approximately two weeks after the Contempt Motion was submitted to the State Court **and one day before the Petition Date**, the Debtor's net accounts receivables were $314,314.63 and its inventory was $1,611.392.38 for a total of $1,925,707.01. Schulder Decl., Ex. "DD." **Thus, since the Contempt Motion had been pending and the June 2nd TRO remained in effect, Summa's receivables Collateral dropped to $65,910.73 representing a further escalation in the rate of receivable deterioration to approximately 46%.** Schulder Decl., Ex. "EE." **Moreover, the total collateral deterioration since March 21, 2008 is $775,950.37, representing approximately 45% of the total Indebtedness.**

   *(b)    Debtor's Failure To Report.*

34.    The Debtor's conversion of the Collateral coincided with its failure to comply with the April 9th Order's Reporting Requirement. This has prevented Summa from accurately monitoring its collateral position and discovering Debtor's fraudulent use of Worldwide or other Bagbag controlled third parties to dissipate Summa's inventory and receivables Collateral. Specifically, Debtor has failed to provide several court-ordered reports that contain detailed information about its own customer account balances.

They include, <u>inter alia</u>, sales, inventory, accounts receivable, and accounts payable reports.

35.    **By withholding this particular accounts receivable data in violation of the Orders, the Debtor has been able to conceal its ongoing transfer of accounts receivable and the proceeds thereof to Worldwide and/or other Bagbag controlled third parties.** Conveniently, Debtor stopped providing these (and other) reports after it created Worldwide.  As of May 2, 2008, Debtor stopped providing these receivables reports with customer data.  As of May 9, 2008, Debtor stopped providing these reports altogether.  Rather, as of May 9, 2008, Debtor has only provided a one page summary report without any customer detail that might have otherwise verified the receivables and inventory left in Debtor's possession. Schulder Decl., Ex. "Y" at ¶ 22.  Summa has not received any reports covering periods after the Petition Date.  Without such customer information, Summa could not further verify the receivables reported in the daily summaries, as well as those created from the sale of Summa's inventory Collateral that were either improperly transferred to Worldwide or other third parties or paid directly to Pace.

36.    This is especially true where, as here, Debtor has produced several reports in connection with fruitlessly defending the Contempt Motion that show write-offs and adjustments against Debtor's accounts. Schulder Decl., Ex. "T" at ¶¶ 16-20.  Indeed, these reports show a corresponding increase in write offs as the State Court Orders were signed.  After the April 9th Order, Debtor wrote off $97,448.89 in receivables and $70,689.76 in inventory.  After the June 2nd TRO, Debtor wrote off an added $175,879.57 in receivables and $109,846.71 in inventory. <u>Id.</u> at ¶ 19.

37.    Moreover, Mr. Bagbag further claims to have "invested" $100,000.00 into Pace, <u>Id</u>. at ¶ 21.  Such investment could have only been improperly made from the Collateral.  The Debtor's "write-offs" and "investment" dovetails with the increasing collateral dissipation that occurred in response to the entry of the State Court Orders.

(c)       *Debtor's Failure to Allow Inspections.*

38.       Consistent with refusing to disclose its manipulation of its assets, Debtor also violated the April 9th Order by denying Summa access to the Premises to inspect the status of the Collateral.  **On the date the June 2nd TRO was signed**, Summa appeared at Debtor's Premises under the auspices of the April 9th Order to review the books and records relating to the accounts receivables.   Bagbag flatly refused.   When pressed about the Inspection Requirement of the April 9th Order, Bagbag acknowledged his awareness of the requirement but nonetheless persisted in his refusal. Schulder Decl., Ex. "T" at ¶ 9.

39.       More recently, on July 3, 2008, **less than a week before the Petition Date**, Summa again tried to exercise its rights under the Inspection Requirement of the April 9th Order.  Specifically, Summa wanted to inspect the status of Summa's inventory and receivables Collateral, including viewing the inventory and reviewing the books and records relating to the accounts receivable.   Again, consistent with Debtor's increasing aggressive tactics, Debtor's employees physically intimidated Summa's principal to leave the premises without having been able to inspect or observe the Collateral. Schulder Decl., Ex. "EE" at ¶ 4.  Such brazen tactics manifest Debtor's intent to violate the Orders and perpetuate its conversion of the Collateral, all to Summa's economic detriment.  The Debtor should not be allowed to employ these same tactics in bankruptcy.

E.    Debtor's State Court Counsel's Motion to Withdraw as Attorneys.

40.       Just a week before the Petition Date, while both of Summa's emergency Replevin and Contempt Motions were pending, the Debtor's counsel in the State Court Action moved to withdraw as the Debtor's attorney and stay the State Court Action (the "Withdrawal Motion").  Schulder Decl., Ex. "FF."  The Withdrawal Motion was returnable on July 11, 2008. Significantly, Summa's Replevin Motion sought seizure of the inventory collateral and Summa's Contempt Motion sought, as a sanction, a money judgment in the amount equal to the dissipated receivable Collateral.   Accordingly, Summa opposed the Withdrawal Motion. Schulder Decl., Ex. "EE."   Conveniently, as a further dilatory tactic, the Debtor petitioned this Court for

bankruptcy protection one day prior to the return date for the Withdrawal Motion. Debtor's Petition has the intended effect of prolonging resolution of Summa's emergency motions and avoiding its obligations under the Agreements.

F.    Debtor's Improper Use of Cash Collateral

41.    Since the Petition Date, the Debtor continues to operate and to improperly use the cash proceeds of Summa's Collateral, which is cash collateral as defined by Section 363(a) of the Bankruptcy Code, without the consent of Summa or approval from the Court, all in brazen violation of the Bankruptcy Code.

42.    By letter dated July 11, 2008, addressed to the Debtor's counsel, Summa's counsel confirmed Summa's objection to the Debtor's use of Summa's cash collateral. Summa's counsel also left a phone message with the Debtor's counsel, which was not returned. Schulder Decl., Ex. "GG".

## THE DEBTOR'S VIOLATION OF SECTION 363 OF THE BANKRUPTCY CODE

43.    Section 363(c)(2) of the Bankruptcy Code provides that:

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease

in accordance with the provisions of this section.

44.    The Debtor has continued to use the Collateral, which is cash collateral, as defined by Section 363(a) of the Bankruptcy Code. The Debtor, however, has neither obtained Summa's consent to use the Collateral, nor has the Debtor obtained authorization from the Court after notice and a hearing. The Debtor, therefore, continues to be blatantly in violation of Section 363(c)(2) of the Bankruptcy Code. An Order should therefore be entered prohibiting the Debtor from using the Collateral without Court approval or consent; prohibiting the Debtor from

improperly converting the Collateral; directing the Debtor to provide an accounting of the Collateral; and providing Summa access to the Collateral and all books and records, including those maintained electronically on computer, relating to the Collateral.

45.    Even assuming the Debtor seeks authorization from the Court to use cash collateral, such relief should not be granted.  Summa will not consent to such use and the Debtor has no means for providing adequate protection pursuant to Section 363(e) of the Bankruptcy Code.  Allowing the Debtor the right to use the Collateral will simply delay the inevitable.  As demonstrated by the Debtor's blatant disregard of the prohibitions imposed by the June 2nd TRO and disregard for the Bankruptcy Code to date, the Debtor will continue to convert the Collateral until there is nothing left and the Debtor will ignore any conditions imposed by the Court in connection with the allowance of the use the Collateral.

## THE AUTOMATIC STAY SHOULD BE LIFTED

46.    Section 362(d) of the Bankruptcy Code permits a creditor to seek relief from the automatic stay and to enforce its lien against property, "because a secured creditor risks losing the benefit of its security interest if it is unable to foreclose against property."  See In re Indian Palms Associates, Ltd., 61 F.3d 197, 206 (3d Cir. 1995); see also In re M.J. & K. Co., Inc., 161 B.R. 586, 590 (Bankr. S.D.N.Y. 1993).

47.    Section 362(d) of the Bankruptcy Code provides, in relevant part, that:

[T]he court shall grant relief from the stay . . .

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if -

       (A) the debtor does not have an equity in such property; and

       (B) such property is not necessary to an effective reorganization;

48.    The Court "shall grant relief" from the automatic stay if either situation exists. Id.; see also Nazareth Nat'l Bank v. Trina-Dee, Inc. (In re Trina-Dee, Inc.), 731 F.2d 170, 170 (3d Cir. 1984) ("Subsections (1) and (2) [of section 362(d)] are plainly disjunctive.").

49.    The allocation for the burden of proof in a relief from stay proceeding is enumerated in Section 362(g) of the Bankruptcy Code, as follows:

> In any hearing . . . concerning relief from the stay . . . -
>
> (1) the party requesting such relief has the burden of proof on the issues of the debtor's equity in property; and
>
> (2) the party opposing such relief has the burden of proof on all other issues.

**A.    CAUSE EXISTS FOR GRANTING SUMMA
RELIEF FROM THE AUTOMATIC STAY**

(i)    Continued Use of Cash Collateral without Court Approval and Summa's Consent in Violation of the Bankruptcy Code

50.    As set forth above, the Debtor continues to violate Section 363(c)(2) of the Bankruptcy Code by using and converting the Collateral, which is cash collateral as defined by Section 363(a) of the Bankruptcy Code, without the consent of the Summa or authority from the Court after notice and hearing.  The Debtor's failure to seek said approval in blatant disregard of the Bankruptcy Code as it has continued to use and convert the Collateral is justification in itself for the relief being sought herein.

(ii)    Conversion of the Collateral

51.    As demonstrated above, including by the imposition of the June 2nd TRO, the Debtor cannot be trusted to fulfill its obligations under the Agreements, including to deliver to Summa the proceeds of Summa's receivables Collateral.  In blatant violation of the State Court Orders, the Bankruptcy Code, and general principles of equity, the Debtor and its principal, Boaz Bagbag, continue to bleed the company dry by using and converting the Collateral without any benefit to the estate or Summa in a systematic effort to deplete the estate and the Collateral.

Summa is prejudiced every day that the Debtor is allowed to remain in possession of the Collateral.

<div align="center">(iii)    <u>Lack of Adequate Protection</u></div>

52.    The Debtor cannot meet its burden of proof to adequately protect Summa's interest in the Collateral.   Since the statutory requirement that the Debtor must adequately protect Summa's interest in its Collateral is mandatory, this is sufficient cause to warrant the relief requested by Summa. <u>See In re Timbers of Inwood Forest Associates, Ltd.</u>, 484 U.S. 365 (1988); <u>In re Martin</u>, 761 F.2d 472 (8th Cir. 1985); <u>In re Saint Peter's School</u>, 16 B.R. 404 (Bankr. S.D.N.Y. 1982); <u>see also</u> <u>In re Swedeland Dev. Group, Inc.</u>, 16 F.3d 552, 564 (3d Cir. 1994) ("[a] debtor has the burden to establish that the holder of the lien . . . has adequate protection").

53.    The requirement of adequate protection is derived from the constitutional protection of property rights provided under the Fifth Amendment of the United States Constitution. H.R. Rep. No. 595, 95th Cong. 1st Sess. (1977).   The Senate Report accompanying the 1978 bankruptcy Reform Act states:

> Adequate protection in the form of either cash payments or a replacement lien must be provided to the creditor whose collateral is decreasing in value or is being consumed during the stay.

S.R.  Rep. No. 95-989, 95th Cong. 2nd Sess. at 4, U.S. Code Cong. And Admin. News, 1978 at 5787, 5790.

54.    The Debtor is unable to provide Summa with adequate protection. Instead, the value of the Collateral continues to rapidly diminish.   The June 2nd TRO prevented the Debtor from conducting business, which means the Debtor has not been generating any new cash flow, has not grown its inventory, and the receivables are shrinking.   As demonstrated above, in fact, the Collateral has been diminishing in value since well before and after the June 2nd TRO was entered.   Even assuming the Debtor had been generating new cash flow and growing its inventory, the Collateral still would not have increased in value because the Debtor has been improperly transferring the proceeds of the Collateral to Worldwide or other Bagbag

controlled third parties.  The Debtor has not and will not replace said value.  This demonstrates that the Collateral has no possibility of increasing in value and the Debtor has no means (and can not be trusted) to provide Summa with adequate protection.

55.    The Debtor's improper conversion and ongoing use of the Collateral is diminishing the value of the Collateral.  Summa, therefore, continues to be harmed while the Collateral remains in the possession of the Debtor.  By contrast, the Debtor, who has no intention to reorganize, as demonstrated by its conversion of the Collateral and failure to file first day motions or the required first day affidavit pursuant to S.D.N.Y. L.B.R. 1007-2, will not suffer any prejudice if Summa is allowed to enforce its security interest in the Collateral.  In fact, by enforcing its security interest, Summa may reduce the balance owed by the Debtor and minimize additional costs and charges that might otherwise accrue on Summa's claim against the Debtor.

(iv)    The Bankruptcy Case was Filed in Bad Faith

56.    Based on the foregoing, this Chapter 11 case was filed in bad faith to hinder, delay, and frustrate Summa's efforts to lawfully enforce its rights in the Collateral.

57.    For all of the foregoing reasons, cause exists under Section 362(d)(1) of the Bankruptcy Code for relief from the automatic stay.  Therefore, relief is warranted under section 362(d)(1) of the Bankruptcy Code.

**B.    THE DEBTOR LACKS EQUITY IN THE COLLATERAL**

58.    The relevant test for determining the Debtor's equity in the Collateral is to compare the aggregate of all claims secured by the Collateral with the current fair market value of the Collateral. In re Saint Peter's School, 16 B.R. 404; In re Boca Development Associates, 21 B.R. 624 (Bankr. S.D.N.Y. 1982).

59.    Upon information and belief, the Debtor lacks any equity in the Collateral since the value of the Collateral does not exceed the Indebtedness.[1]

---

[1] According to the Debtor's own Chapter 11 petition, the value of Summa's collateral is less than its claim.  While Summa disputes the Debtor's valuation in its bankruptcy

*continued on the following page…*

## C.    THE COLLATERAL IS NOT NECESSARY FOR AN
## EFFECTIVE REORGANIZATION OF THE DEBTOR

60.    The Debtor must also satisfy its burden of proof that the Collateral is necessary to an effective reorganization. See, United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd., 448 U.S. at 365; In re Jason Realty, L.P., 59 F.3d 423, 430 (3d Cir. 1995) (debtor has burden "to demonstrate that there was 'a reasonable possibility of a successful reorganization within a reasonable time'") (citation omitted); Nazareth Nat'l Bank, 731 F.2d at 171 ("debtor had the burden of proving that the property in issue is necessary to an effective reorganization"); In re de Kleinman, 156 B.R. 131 (Bankr. S.D.N.Y. 1993); In re Diplomat Electronics Corp., 82 B.R. 688 (Bankr. S.D.N.Y. 1988).  Justice Scalia explained in the Timbers case that once the creditor makes a showing of lack of equity in its collateral, the burden shifts to the debtor to show that the collateral is necessary for an effective reorganization.  For a debtor to meet this burden, it must prove that that the property (the Collateral) is essential for an effective reorganization and that there is "a reasonable possibility of a successful reorganization within a reasonable time period." 484 U.S. at 365 (quoting decision of the Fifth Circuit in Timbers at 808 F.2d 363, 370-71 and footnote 12-13).

61.    The Debtor cannot meet its burden of proof on this issue.   As demonstrated above, the Debtor cannot provide Summa with the adequate protection to which the Bankruptcy Code entitles it, thus the Debtor must be precluded from using the Collateral. Because the Debtor is precluded from using the Collateral and operating, clearly the Collateral is not needed for an effective reorganization.  Based on the Debtor's conversion of the Collateral and its failure to file any first day motions, it is clear that the Debtor has no intention of reorganizing and that an effective reorganization is not possible.  Furthermore, the Debtor's

---

*…continued from the preceding page*

petition, Summa believes that there will be no surplus collateral available to the Debtor's estate after payment of Summa's claim.

prepetition wrongdoing by using and converting Summa's Collateral in violation of the State Court Orders, and its ongoing wrongdoing by using cash collateral in violation of the Bankruptcy Code and using and converting the Collateral, demonstrate that the Debtor cannot be trusted to discharge its fiduciary duties as a debtor-in-possession.    There is also no source of unencumbered funds available to the Debtor to continue its business and the Debtor is, therefore, far too under water to confirm a plan.  The Debtor, therefore, does not need the Collateral for an effective reorganization and relief is warranted under Section 362(d)(2) of the Bankruptcy Code.

## PROSPECTIVE RELIEF

62.    Because the Debtor filed this bankruptcy case in bad faith and without any intention of reorganizing, and for no other reason than to avoid Summa's attempts to enforce its rights in the Collateral, Summa requests that any Order approving this Motion provide that if the above-captioned bankruptcy case is dismissed and the Debtor files a subsequent bankruptcy case within 180 days of said dismissal, Summa's rights under the Order shall remain in full force, and the automatic stay imposed in said case shall not stay any of Summa's rights under said Order.

## CONCLUSION

63.    For the reasons set forth above, the instant Motion should be granted and an Order should be entered: (a) lifting the automatic stay to permit Summa to exercise all of its rights and remedies under (i) the Agreements, (ii) the Uniform Commercial Code and (iii) other applicable law, including, without limitation, to take all action necessary to enforce its security interest in the Collateral, including, without limitation, collecting accounts receivable, selling inventory, and applying all proceeds in reduction of the Indebtedness; (b) directing the Debtor to segregate, account for and turn over to Summa all cash collateral and other Collateral of Summa in the Debtor's possession and control; (c) granting Summa access to recover its Collateral; (d) directing the Debtor to turn over to Summa all books and records, including those maintained electronically on computer, relating to the Collateral; (e) prohibiting the Debtor from using the Collateral without Court approval or consent; (f) prohibiting the Debtor from improperly converting the Collateral; and (g) allowing for the relief sought herein to remain in full force if

the Debtor's bankruptcy case is dismissed and it files another bankruptcy case within 180 days of said dismissal, without the need to seek further relief from the automatic stay.

### WAIVER OF FILING OF MEMORANDUM OF LAW

64.    As this motion presents no novel issues of law and the authorities relied upon herein are set forth above, Summa requests that the Court waive the requirement of S.D.N.Y. L.B.R. 9013-1(b) requiring the filing of a separate memorandum of law.

### NOTICE

65.    Summa provided notice of this motion to (a) the Debtor and its counsel; (b) the United States Trustee for the Southern District of New York; (c) any other party who has requested notice in the above-captioned bankruptcy cases; (d) the Debtor's largest unsecured creditors listed on the Debtor's Chapter 11 petition; and (e) all other parties entitled to notice under the Bankruptcy Code and Rules.

66.    No previous request for the relief sought in this motion has been made to this Court or any other court.

WHEREFORE, Summa respectfully requests that this Court enter an Order granting Summa relief from the automatic stay and related relief, and other and further relief as this Court deems just and proper, including prohibiting the Debtor from using and converting the Collateral.

Dated:      New York, New York
            July 16, 2008

<div style="margin-left:35%">

**LOWENSTEIN SANDLER PC**

By: /s/ David M. Banker
Bruce S. Nathan (BN 4844)
Bruce Buechler (BB 0324)
David M. Banker (DB 3278)
Stefan B. Kalina (SK 8535)
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 262-6700

Counsel to Summa Capital Corp.

</div>