**LAW OFFICES OF DANIEL M. KATZNER, PC**
Daniel M. Katzner (DK9689)
1025 Longwood Avenue
Bronx, NY 10459
Tel.: (718) 589-3999

Counsel to the Debtor

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** | HEARING DATE: JULY 21, 2008 |
| **SOUTHERN DISTRICT OF NEW YORK** | HEARING TIME: 2:00 P.M. |

---------------------------------------------------------X

In re:                                                            Chapter 11

Pace Product Solutions, Inc.                        Case No. 08-12666 (MG)


                                    Debtor
---------------------------------------------------------X

## DEBTOR'S OBJECTION TO MOTION OF
## SUMMA CAPITAL CORP. FOR RELIEF FROM
## THE AUTOMATIC STAY AND FOR RELATED RELIEF

The debtor, Pace Product Solutions, Inc. (the "Debtor"), by and through its counsel, The Law Offices of Daniel M. Katzner, P.C., as its objection to the motion of Summa Capital Corp. ("Summa") for relief from the automatic stay and for related relief (the "Motion") , respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      The Motion filed by Summa should be denied due to the fact that Summa has failed to demonstrate adequate cause for lifting the automatic stay and thus has not met its initial burden of presenting prima facie evidence necessary to sustain its motion for relief.  Instead, Summa relies on its misrepresentation of the facts and conclusory allegations as to the Debtor's actions to support its contention that Summa's collateral is not adequately protected.

2.      The Debtor will show that (i) at no time before or after the filing of this petition has the Debtor taken any actions to defraud the creditors of the bankruptcy estate or to dissipate its inventory or other secured collateral, (ii) the Debtor filed the within Chapter 11 petition for the exact reasons that the Bankruptcy Code was enacted, which was to provide a "breathing spell" from creditor action and to effectuate a reorganization of the business so as to provide the maximum benefit to itself and the creditors of the estate and (iii) the "bare bones petition" was only filed based on the pressing need obtain the relief of the automatic stay and prevent Summa from the constant harassment of the Debtor's clients and the resulting deterioration of its business and not in bad faith.

3.      If the Court finds that Summa has presented prima facie evidence that is not adequately protected, then the Debtor should be permitted to provide additional protection in lieu of the drastic remedy of vacating the automatic stay (i) in the form of periodic payments that will compensate Summa for any decrease in the inventory, equipment, accounts receivables and other secured assets ("the Collateral"), (ii) by providing Summa with some form of supervisory role in an ongoing basis to ensure that the Debtor is not impermissibly dissipating or converting the Collateral and/or (iii) by extending Summa's security interest to any non-debtor entities affiliated with the Debtor that are necessary to provide adequate protection to the Collateral.

4.      Summa has also failed to meet its burden of proof as to lifting the stay under Section 362(d)(2) of the Bankruptcy Code due to the fact that Summa's own moving papers demonstrate that the current value of the secured property exceeds the total liens by a substantial amount.  The Collateral is also clearly necessary for effective reorganization as the Debtor is an auto-parts distributor and repair shop that uses the secured property in all aspects of its day-to-day operations.

5.      Moreover, for the Court to grant the related relief requested by Summa in addition to lifting the automatic stay would not only defeat the legitimate purposes of this filing, but would also provide Summa with a remedy which they have been unable to obtain in State Court. Summa only seeks the relief of taking possession and liquidating the Collateral to circumvent the meritorious defenses the Debtor has to the underlying State Court action and to obtain the maximum benefit to itself to the detriment of all interested parties in these proceedings.

6.      It must be emphasized that the vast majority of the facts presented by Summa in its Motion are false and misleading and are constantly presented in such a way to distort the actual series of events that led to the filing of the Debtor's Bankruptcy Petition.

7.      For all of the foregoing reasons, Summa's Motion for relief from the automatic stay and for related relief should be denied, or in the alternative, the relief granted must be limited to permitting Summa to proceed with its State Court action rather then providing them with the related relief of a turnover of all of the Collateral.   In the unlikely event that the Court Orders the drastic related relief of providing all the Collateral to Summa, then the Debtor would request that either a trustee be appointed to manage the estate or a short stay be given to permit it to file moving papers to convert this action to a Chapter 7 proceeding.   This would allow all parties, including the unsecured creditors and United States Trustee, to be heard and ensure the maximum amount is obtained for the assets of the bankruptcy estate.


**FACTS**

A.    Summa's Breach of the Secured Financing Agreement with the Debtor.

8.      On July 10, 2008, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").   The Debtor continued in

possession of their property and the management of its business as a debtor in possession

pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9.       The Debtor is an auto-parts distributor, automobile repair shop and sleep

operation that was formed approximately three (3) years ago.

10.      On or about January 10, 2006, the Debtor entered into a Financing Agreement

(the "Financing Agreement") with Summa wherein Summa agreed to make working capital line

of credit available to the Debtor in exchange for the payment of interest at the rate of "prime rate

plus seven percent", payable at the close of each month.  See, Motion of Summa Capital Corp.

for Relief from the Automatic Stay dated July 16, 2008 ("Summa Motion"), Ex. A.  As collateral

for the Financing Agreement, the Debtor provided Summa with a security interest in the

Collateral. Id.

11.      The Debtor went on to purchase a separate entity named Flash Sales, Inc.

("Flash") in May, 2007, which enabled the Debtor to increase its inventory substantially.  The

Debtor continued to operate the two businesses at separate locations, but due to the loss of

income caused by incurring almost twice the necessary expenses, it eventually decided to

consolidate its operation at Flash's principal place of business at 122 School Street, Yonkers,

New York.  The consolidation of these operations was done with the full knowledge, approval

and consent of Summa.  See, Declaration of Boaz Bagbag dated July 21, 2008 ("Bagbag Decl."),

Exhibit ("Ex.) "A" at 2.

12.      In or around January, 2008, Summa claimed that the Debtor did not have

sufficient Collateral and abruptly and without any notice to the Debtor, ceased advancing it

monies under the Financing Agreement.  At no time during the parties relationship was there

ever a problem between the Debtor and Summa regarding the amount of accounts receivables or

inventory maintained as Collateral and there had been no change in assets by the Debtor causing this cessation.    Indeed, the amount of the Collateral always remained at around $2.5 million. Bagbag Decl., Ex. "A" at 3 & Ex. "C".

13.    Summa's termination of the credit line was the first breach by either party of the Financing Agreement and eventually led to significant damages being incurred by the Debtor and the deterioration of its business.  The Debtor was no longer able to pay its suppliers and make payroll and consequently, in order to meet its obligations, the Debtor was eventually forced to stop sending the full accounts receivables to Summa.  Id. at 3.

14.    Summa alleges that the decision to stop providing money to the Debtor was based on the premise that the Debtor was converting the inventory and accounts receivable to dissipate Summa's security.  See, Summa Motion, 5-6.  These allegations are false and misleading and are based on nothing more than Summa's own incorrect calculations and omissions as a means to recover the outstanding debt owed by the Debtor rather than abiding by the Security Agreement. Id.  All of the figures set forth in Summa's Motion to show the alleged illegal acts of the Debtor are almost entirely all bookkeeping adjustments to the Collateral's value and were made with the full knowledge and consent of Summa and its accountants.  Bagbag Decl., Ex. "B" at 3-4.

15.    There is also nothing in the Financing Agreement requiring the Debtor to maintain a certain amount of inventory on hand as Collateral and that any amount under a stated threshold would result in a default.  Bagbag Decl., Ex. "A" at 2; see also, Summa Motion, Ex. A. Bagbag Decl., Ex. "A" at 3. **Moreover, the Motion even states that at the time of the alleged default, "Debtor's net accounts receivables were $975,982.22 and its inventory was $1,784,184.34 for a total of $2,760,166.56, whereas Summa alleges to have been owed only $1,506,253.35.**  Summa Motion at 11 and 6.    Although these figures are disputed, they

demonstrate that from Summa's point of view, there remained over $2.7 million in Collateral and there was no basis for it to cease sending funds under the line of credit.

16.    Admittedly, Summa's presentment of the asset values as of the various dates leading up to this filing may lead one to believe that the Debtor was in fact liquidating assets. However, a closer inspection of these numbers shows that **the vast majority of the decrease and numerous calculations of deterioration resulted from the write-off of approximately $500,000.00 in accounts receivable and not from the actual transfer of any physical assets or inventory.** Bagbag Decl., Ex. "B" at 4; Summa Motion at 11-12.

17.    The adjustments to the accounts receivable were for bad debts and "contra-accounts" and were done with the full knowledge and consent of Summa. Bagbag Decl., Ex. "B" at 3-4. During the parties' relationship, Summa never treated receivables ninety (90) days past due or "contra-accounts" as part of the Collateral and this was always removed from the balance of accounts receivable. Id. "Contra-accounts" are those accounts where the Debtor has an outstanding balance to the supplier or customer and the debt is removed for bookkeeping purposes. Id.

18.    It must be emphasized that Summa's accountant, Stanley Nasberg, approved all of these adjustments made in the Debtor's books and records regarding the bad debts and "contra-accounts" and this had consistently been the bookkeeping practice during the duration of the parties relationship. Bagbag Decl., Ex. "B" at 4. Summa was fully aware of why the amount of accounts receivables decreased so much and the assertions in the Motion that the Debtor is somehow secretly diverting its receivables is false. Id. **Regardless, the fact that the only significant change was to the receivables clearly demonstrates that there was and has been**

no dissipation of assets as Summa proposes, but only changes on the Debtor's books based on the perceived inability to collect those funds.

19.    It must also be stated that **Summa has not submitted any proof at all to support its contention that it is owed $1,506,253.35.**    Prior to the breach by Summa and commencement of litigation, the Debtor had paid Summa approximately $6,500,000 between January, 2006 and February, 2008 and was current at that time with all outstanding obligations. Bagbag Decl., Ex. "A" at 6. **The Debtor continued to pay the sum of $10,000 per month in accordance with the original Financing Agreement even after the alleged breach.** Id.

20.    It is also important to demonstrate that since the Petition date, the Debtor has not liquidated or diverted any assets.  The balance of the Debtor's inventory as of April 1, 2008 was $1,731,660.59, as of July 1, 2008 was $1,620,542.97, the balance on the date of the petition, July 10, 2008 was $1,609,024.10 and the last balance on July 15, 2008 was $1,610,861.88. Bagbag Decl., Ex. "C", "D", "E" and "F" respectively.  This clearly demonstrates that the inventory has not changed anymore than the standard fluctuation that is in the normal course of business.  Id.

21.    Moreover, the sample of the Debtor's current inventory list shows the extent of inventory that is in the Debtor's possession and demonstrates that nothing has been transferred. Bagbag Decl., Ex. "G".  Moreover, even if the Debtor wanted to divert or hide assets on its books, the computer system of the Debtor has detailed reports showing all internal transactions of the business and it simple can not be done.  This demonstrates that contrary to the blanket allegations of Summa, there have no actions taken by the Debtor divert the Collateral or defraud the bankruptcy estate.

22.    As to the decreases in the value of the inventory, **it is disingenuous for Summa to allege that value of the inventory is decreasing when the only reason the Debtor can not**

**replenish the inventory is due to Summa's illegal termination of the credit line. Moreover,**
**even assuming that the Debtor's profitability and value of its assets have been declining,**
**this is a perfectly legitimate basis upon which to seek relief under the Bankruptcy Code**
**and is by no means fraudulent or improper.**

23.    Although the Debtor did not cause the default of the Financing Agreement,
Summa started an action in the Commercial Division of the Supreme Court of the State of New
York, Westchester County (the "State Court"), entitled "Summa Capital Corp. v. Pace Product
Solutions, Inc. et. al., Index Number 5998/08". Summa Motion at 6. Summa made many of the
same allegations contained in this Motion in that action while the Debtor asserted its meritorious
defenses and counterclaims. See Bagbag Decl., Ex. "A", see also Bagbag Decl., Ex. "H" and
"I".

24.    In addition to the counterclaim for the breach of the Financing Agreement and
damages resulting to its business, the Debtor has evidence that Summa was charging improper
interest during their relationship. Bagbag Decl., Ex. "J". The appropriate percentage was
supposed to be seven percent over prime, but a cursory review of the Debtor's exhibits, which
shows a small sample of the total amount of payments made by the Debtor to Summa, show they
were charging significantly more than this. Id. at 5-6. The Debtor has requested an explanation
from Summa of the basis for its interest charges from January, 2006 to the present, but Summa
has refused to provide them**.** Id.

25.    Plaintiff is distorting the facts and circumstances leading to the Debtor's petition
in an attempt to prejudice the Debtor before this Court for the sole purpose of obtaining the
ultimate relief they seek. Despite their contentions, however, **at no time has Summa been**

**granted the relief by the State Court to repossess or take control of the assets of the Debtor.**
Id.

B.      The Debtor has Complied with the April 9, 2008 So Ordered Stipulation

26.      In the spirit of cooperation and to allay Summa's fears of dissipation, the Debtor entered into a stipulation that was So Ordered by the State Court on April 9, 2008 (the "Stipulation") to provide Summa access to its premises and books and records to verify that there was substantial Collateral in place for the credit line.   Bagbag Decl., Ex. "B" at 3; Summa Motion, Ex. "N".   The Debtor has complied with the reporting and access requirements of the Stipulation and it is only Summa's continued attempts to obtain possession of the Collateral that they are alleging a breach of the same.   Id.

27.      Between April 9, 2008 and May 8, 2008, the Debtor provided Summa and its accountants with detailed reports as required by the Stipulation.   Bagbag Decl., Ex. "B" at 3. Indeed, this is confirmed by the fact that many of the documents annexed to Summa's Motion are the same documents the Debtor turned over pursuant to the Stipulation.   See generally Summa Motion.   The Debtor also provided Summa and its accountants access to the premises and books and records as required by the Stipulation.   Id. at 5.

28.      Despite the Debtor's compliance with the reporting and access requirements of the Stipulation, Summa used the receivable reports and the information therein to harass, annoy and threaten the Debtor's customers.   Id.; see also Summa Motion at 7.   Summa began calling customers and demanding the outstanding accounts receivables of the Debtor be paid directly to them.   They informed them that any payments made to the Debtor would not reduce their obligations, so the customers simply stopped paying their debts in fear that they would be

double-billed or end up in litigation.  Summa's Motion even admits to these threats where it states that Summa told customers that if they paid the Debtor and not them, they would not reduce their obligations.  Summa Motion, Ex. "M".

29.    To combat this improper tactic and violation of the Stipulation, the Debtor began sending summarized inventory reports that did not disclose specific information about customers to reduce Summa's ability to interfere with its business.  Bagbag Decl., Ex. "B" at 6.  Summa's contention that the Debtor had ceased providing any reports is simply not true.  Id.  Further, the Debtor's still permitted unlimited access to the physical inventory as recently as June 2, 2008 to show there was no dissipation, but Summa's accountant was prevented from access to the books and records for the sole purpose of preventing it from obtaining more information about its customers.  Id.

30.    However, even these limitations proved to be insufficient to stop the escalating harassment of the Debtor's customers and their resulting failure to pay the amounts owed, so rather than closing the business, the Debtor formed Worldwide Flash Auto Parts, Inc. ("Worldwide") Id. at 5.


C.    The Formation of Worldwide was Necessary and not in Violation of any Orders.

31.    Summa's claims that the Collateral is being diverted through a separate corporation named Worldwide is another misleading assertion with no actual substance behind it. It is undisputed that Worldwide is a wholly owned subsidiary of the Debtor that was formed on or about April 22, 2008 and that there has been no actual transfer of any assets to this entity. Bagbag Decl. at 2; Summa Motion, Ex. "P".  This organization was not formed in contravention to any State Court Order, the Stipulation or any other law despite Summa's misleading assertions

to the contrary.  See id., Summa Motion at 9.  The only order that had been entered at the time of Wordwide's formation was the Stipulation and nothing contained therein restricted the Debtor from using a subsidiary to carry on a portion of its business.  Id.

32.    Worldwide was not created, as Summa suggests, to defraud, deceive or to circumvent the Stipulation.  Rather, Summa's actions, namely, using the reports and other information provided to it by the Debtor to harass its customers and damage its business, necessitated forming Worldwide to keep the Debtor's business operating by providing a means for customers to send accounts receivables.  Bagbag Decl., Ex. "B" at 5; see also Summa Motion at 7.  In fact, the Debtor never hid or misled Summa that a subsidiary had been formed, as Mr. Schulder was notified of Worldwide's existence and its relationship to the Debtor.  Bagbag Decl., Ex. "B" at 5.

33.    **It must be emphasized that no assets have been transferred out of the Debtor's possession and that the only change to allow Worldwide's operation was to the Debtor's internal bookkeeping system on or about May 1, 2008.  All money that has been paid to Worldwide has been deposited into the same account as the Debtor and has not been diverted in any way, shape or form.**  Bagbag Decl. at 2.  **Moreover, the entire inventory of the Debtor remained exactly the same both before and after the bookkeeping change at its place of business.**  Bagbag Decl., Ex. "K" and "L".  **There has been no movement or dissipation of inventory or any other action to hide assets from Summa, but rather a new entity was formed as a last resort to allow the continued operations of the Debtor's business.**

34.    It should also be pointed out that the State Court never granted Summa's motion for contempt and at no time was Summa authorized to take possession of any of the Collateral.

The Stipulation authorized the continuation of Debtor's business and permitted the sale of the inventory in the ordinary course of business.  Summa Motion, Ex. "N".  Summa's motion for contempt was still before the State Court at the commencement of this bankruptcy proceeding and, even assuming that Summa proved all of their allegations, **the Debtor has numerous meritorious defenses to the relief sought.**  Bagbag Decl., Ex. "M".

35.    In addition, the Debtor remains in full compliance with the State Court's Temporary Restraining Order entered on June 2, 2008.  Summa Motion, Ex. O.  **To this day, all of the Collateral that was in the Debtor's possession as of the date of entrance of that Order remains in the Debtor's possession exactly as it did then and can be fully accounted for.**  .  Bagbag Decl. at 2.  The only business that has been conducted since that time has been with property acquired with the personal funds of the Debtor's President, Boaz Bagbag, and on credit from suppliers, and only as absolutely necessary to continue the business.  Id.


D.    The Debtor has Complied with the Bankruptcy Code since Filing its Petition.

36.    Contrary to the allegations of Summa, at no time after the filing of this petition has the Debtor taken any actions to defraud the creditors of the bankruptcy estate, to dissipate its inventory, accounts receivable or to liquidate the cash collateral that has been acquired post-filing.  Summa has submitted no evidence to support these blanket allegations and they should not be considered by the Court as a result.

37.    Assuming that Summa has met its burden of proof on this issue, which as discussed below it has not, the Debtor would submit that it has maintained and can properly account for all of the property that has been acquired since the filing of its petition and the only actions that it has taken are those done in the ordinary course of business by a debtor in

possession. The balance of the Debtor's inventory as of July 1, 2008 was $1,620,542.97, the balance on July 10, 2008 was $1,609,024.10 and the last balance on July 15, 2008 was $1,610,861.88. Bagbag Decl., Ex. "D", "E" and "F". This clearly demonstrates that the inventory only changed $9,681.09, which is a standard fluctuation in the normal course of business. Id.

38.    In addition, the Debtor has in its possession all of the cash collateral that it has received both before and after the filing of the Petition and can properly account for the same. Bagbag Decl., Ex. "N". All cash that has been received has been deposited into the business's account and the only funds that may have come out are those checks written prior to filing and the bare minimum of cash necessary to continue its operations as a debtor in possession. Bagbag Decl., Ex. "O". This money was not used to knowingly violate the Bankruptcy Code or any other law, but simply as the only way of keeping the business operating after filing the petition.

39.    The Debtor has in its custody and is prepared to deposit the exact amount that has come out of its accounts into a segregated debtor in possession bank account. Bagbag Decl. at 3. The debtor already attempted to open a new account and transfer both the existing sums and those that may have been expended, but based on an earlier freeze to the President's social security number and the requirements of the bank to first release it, has been unable to do so yet. The Debtor can immediately transfer to a debtor in possession bank account all cash collateral should the Court permit this case to proceed. Id.

**OBJECTION**

A.    Summa Has Failed to Demonstrate Adequate Cause for Relief from the Automatic Stay.

40.    The automatic stay is "'a crucial provision of bankruptcy law' intended to 'prevent disparate actions against debtors . . . [and] ensure that no creditor receives more than an equitable share of the bankrupt's estate.'"   In re Boodrow, 126 F.3d 43, 48 (2d Cir. 1997). Pursuant to Section 362(d)(1) of the Bankruptcy Code, a party in interest may seek to have the automatic stay lifted "for cause," including the lack of adequate protection.  See 11 U.S.C. § 362(d)(1). Courts have consistently emphasized that "a bankruptcy court should deny relief from the stay if the movant fails to make an initial showing of cause."  In re Boodrow, 126 F.3d 43 at 48.  Only if the movant makes such a showing does any burden shift to the debtor; absent a showing of cause, the court should simply deny relief from the stay. See Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 142 (2d Cir. 1999); In re Planned Systems, Inc., 78 B.R. 852, 860 (Bankr. S.D. Ohio 1987).

41.    Summa attempts to allege cause for relief from the automatic stay by claiming that the Debtor has been illegally converting the Collateral.  Summa attempts to support this position by showing that the value of the inventory and receivables have decreased over the past several months.  As explained above, though, the only reason for this change is due to the write-off of bad debts and "contra-accounts" and not due to any diversion or withholding of receivables or cash collected from customers.  With regards to the value of the inventory, it is preposterous that Summa is alleging that they are not adequately protected because of the decreasing value when the only reason the Debtor can not replenish the inventory is due to Summa's termination of the credit line.  Surely, a creditor can not show cause for relief from the stay when that cause directly results from their own actions.

14

42.     Moreover, even assuming that the Debtor's profitability and value of its assets have been declining, this is a perfectly legitimate basis upon which to seek relief under the Bankruptcy Code and is by no means fraudulent or improper.  It is most likely safe to say that the vast majority of businesses seeking reorganization under the Bankruptcy Code are experiencing some decline in their profitability and resulting asset value and this should not be deemed sufficient to show cause.

43.     Summa also alleges that Debtor has continued to use cash collateral without Court approval in violation of Section 363(c)(2) of the Bankruptcy Code.  What Summa fails to do, however, is submit any documentary evidence or proof whatsoever in support of these contentions, but rather assumes that its allegations are sufficient to shift the burden to the Debtor. As a result, Summa has not made the *prima facie* case necessary to sustain a motion to lift the automatic stay on the grounds that Summa's interest is not adequately protected.  As a result, the burden has not shifted to the Debtor and the Court must simply deny the relief.

44.     If it is determined, however, that the burden has shifted, the Debtor has demonstrated that any use of cash collateral after the filing of its petition was only to continue its operations as a debtor in possession and not for any fraudulent purpose.  The Debtor has the equivalent of all cash collateral that it has received both before and after the filing of the Petition in its possession and can deposit the same into a segregated debtor in possession bank account immediately.   There should be no dispute that if it is determined that these actions were improper, they do not rise to the level of flagrant violation as proposed by Summa to give cause for relief from the stay, but rather were a mistake made by the Debtor to try and save its business that it should be given an opportunity to remedy.

45.     The other "cause" alleged in the Motion is that the Debtors have filed this case in

bad faith.  As demonstrated by the facts set forth above and the Debtor's strict compliance with

this Court's Order, there should be no question that this Case was filed only for the purpose of

effectuating a reorganization to the benefit of all creditors of the estate.  Any allegation that the

failure to file the first day pleadings is indicative of the lack of intention of proceeding with this

Case is similarly without merit.  The minimum filing was only done due to the pressing need to

impose the automatic stay and the Debtor and its counsel has every intention of complying with

the Bankruptcy Code and all Local Rules.  Any failure to file necessary pleadings was done

inadvertently and likely will have no prejudicial effect on this matter.


B.      <u>If Summa is not Adequately Protected, the Debtor Should be Permitted to Provide
        Additional Protection rather than Vacating the Automatic Stay</u>.

46.     Assuming that the Court determines that the Motion sets forth a prima facie case

for cause for relief from the stay and the burden has shifted to Debtor, Summa's interest is

adequately protected.  It is well established that an equity cushion, if sufficiently large to ensure

that the creditor will receive the full amount of its lien, may be considered adequate protection.

See In re Elmira Litho, Inc., 174 B.R. 892, at 903 (Bankr. S.D.N.Y. 1994).  If a debtor asserts

that equity in a property by itself provides adequate protection, and the creditor fails to offer

sufficient evidence on the question of equity, then the debtor should prevail. In re Raymond, 99

B.R. 819 (Bankr. S.D. Ohio 1989); In re Boisvert, 4 B.R. 664 (Bankr. D. Mass. 1980).

47.     **In the instant matter, Summa has actually admitted in their moving papers**

**that the current value of the Collateral far exceeds the total liens.**  As stated above, the

current lien claimed by Summa without any supporting evidence is $1,506,253.35.   Summa

Motion at 6.  As of July 9, 2008, the day before the filing of the petition, Summa asserts that

accounts receivables were $314,314.63 and the inventory was $1,611,392.38, for a total value of $1,925,707.01, creating an equity cushion of $419,453.66. Summa Motion at 12. **This is almost a 30% cushion on the amount of the secured claim and does not take into account the value of cash collateral, equipment, automobiles and other assets of the Debtor, which amount to at least an additional $100,000.00.** Accordingly, even if the Debtor is permitted to sell a portion of the Collateral in the ordinary course of business, Summa is adequately protected.

48.    Accordingly, there is no threat that the value of the Collateral will decline below the amount of Summa's secured lien. This equity cushion should be sufficient to provide adequate protection, but the Debtor would also be willing to provide Summa with some form of additional protection in lieu of vacating the automatic stay.

49.    The first means of additional adequate protection would be to make periodic cash payments at least to the extent of a decrease in the value of the Collateral. See In Re Bermec Corp, 445 F.2d 363 (2d Cir. 1967); 11 U.S.C. §361(1). Debtor would also be willing to provide additional payments that the Court deems sufficient pending the outcome of the Debtor's reorganization. The Debtor believes that if were entitled to remain a debtor in possession with the automatic stay in place, it could provide at least $30,000.00 per month to Summa, which is far more than any decrease in the Collateral.

50.    The second method the Debtor would propose is to provide an additional or replacement lien on other property to the extent the stay or other activities of the Debtor affects Summa's interest in the Collateral. 11 U.S.C. §361(2). As explained above, Worldwide was not formed to defraud Summa, but rather as a last resort to continue to operate the Debtor and realistically there has been no actual conversion of any assets. With that said, the Debtor would

have no objection to extending Summa's security interest to Worldwide or any other entity that they believe may be in possession of the Collateral.

51.        Finally, the Debtor would be willing to provide some supervisory role to the executives of Summa in an ongoing to basis to monitor the actions of the Debtor and ensure that no assets are being transferred for illegal purposes.  This would not only protect Summa from any alleged deprecation of their assets, but also give them a means with which to protect their security interest and the ability to raise any alleged misconduct with the Court.  11 U.S.C. §361(3).

52.    This willingness to cooperate with Summa and provide them with any or all of the above additional protection should be taken into consideration by the Court as yet another means of demonstrating the legitimate purposes for which this petition was filed.


C.        The Debtor has Significant Equity in the Collateral.

53.    Summa has also sought relief under section 362(d)(2) of the Bankruptcy Code. Relief from the automatic stay is appropriate under section 362(d)(2) only if a debtor does not have equity in the property at issue and the property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2).  Pursuant to Section 362(g) of the Bankruptcy Code, "the party requesting such relief has the burden of proof on the issue of the debtor's [lack of] equity in property." 11 U.S.C. § 362(g).  "The classic test for determining equity under 362(d)(2) focuses on a comparison between the total liens against the property and the property's current value." In re Indian Palms Assocs., Ltd., 61 F.3d 197, 206 (3d Cir. 1995)

54.    As detailed above, Summa has actually admitted in their moving papers that the total liens on the collateral do not exceed its current value by at least $419,453.66.  This is

18

almost a 30% cushion on the amount of the secured claim and does not take into account the value of cash collateral, equipment, automobiles and other assets of the Debtor, which amount to at least an additional $100,000.00.    Further, the valuation method used by the Debtor for inventory is based on the cost of goods sold and should be beyond reproach.

D.    The Collateral is Necessary for Effective Reorganization

55.    It is clearly disputed that there is no equity in the property, but should the Court determine that to be the case, then there still can be no legitimate contention that the Collateral is not necessary for effective reorganization.  Summa attempts to defeat this position by using circular logic that says the Debtor cannot provide adequate protection for the Collateral, so therefore they must turn over the Collateral and, a result, the Collateral is not needed for effective reorganization.  Quite simply, this makes no sense.

56.    The Collateral that Summa is attempting to recover is crucial to the reorganization of the Debtor's business.  The Debtor is an auto-parts distributor and repair shop that uses the Collateral in all aspects of its day-to-day operations.  If Summa were permitted to recover the Collateral, then there would effectively be nothing for the Debtor to sell.  This would eliminate any opportunity for the Debtor to continue its business and to reorganize in such a way that would allow it to pay back the creditors of the bankruptcy estate.

57.    If the automatic stay were to remain in effect, Summa would be prevented from harassing the Debtor's customers and could then collect the outstanding accounts receivable owed to it.  This, in addition to the sale of inventory and the cash-flow created thereby, would be a perfectly effective means of reorganization that could save this business.

## THE REQUESTED RELIEF SHOULD BE DENIED

58.     There is clearly no basis for the drastic relief of seizure of the Collateral.  Summa has not obtained that relief in the State Court and should not be permitted to circumvent the Debtor's defenses in that action.  If the collateral is seized, the Debtor will be irreparably harmed and will go out business. Likewise, if the Debtor is directed to turn over all proceeds of its sales to Summa or to place such monies in escrow, the Debtor would be unable to pay its suppliers, make payroll, or otherwise run its day-to-day operations.   This would be an unduly harsh sanction in view of the Debtor's meritorious defenses to Summa's allegations.  Summa's own Motion also demonstrates that the value of the Collateral is significantly greater than the amount of its claim.  To permit Summa to take the collateral and liquidate it would result in Summa being made whole to the detriment of all other creditors of the bankruptcy estate.

59.     Further, the current value of the inventory even according to Summa is over $1,600,000.00.  Summa Motion at 12.  If Summa were to take control of the Collateral or if the Debtor were forced to liquidate the business, the most that could be obtained from the sale would be between twenty-five to fifty cents on the dollar.  This would result in only $800,000.00 being recovered for the bankruptcy estate.  **However, if the Debtor were permitted to reorganize or at least remain in business, it could earn approximately $1.30 for every $1.00 of inventory, or $2,080,000.00, an additional $1,280,000.00.**  This would not only be sufficient to repay Summa, but to also pay a large portion of the unsecured claims of the estate without even considering the additional assets and profit that could be earned in the future.

60.     In the unlikely event that the Court Orders the extensive related relief requested by Summa to take possession of all the Collateral, then the Debtor would request that either a trustee be appointed to manage the estate or a short stay be given to permit it to file moving

papers to convert this action to a Chapter 7 proceeding.  See U.S.C. § 1106(b), 1106(a)(3) &

(a)(4); U.S.C. § 1112.    This would allow all parties, including the unsecured creditors and

United States Trustee to be heard, and ensure the maximum value is obtained for the assets of the

bankruptcy estate.

## **CONCLUSION**

For all the foregoing reasons, the Debtors respectfully request that this Court deny

Summa's Motion.

Dated: Bronx, New York
     July 21, 2008

           /s/ Daniel M. Katzner
           Daniel M. Katzner, Esq. (DK9689)
           Counsel for the Debtor
           1025 Longwood Avenue
           Bronx, NY 10459
           Tel.: (718) 589-3999